## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KARIMAH BILAL,<br><br>*Complainant,*<br><br>v.<br><br>CHIEF OF POLICE OF THE<br>METROPOLITAN POLICE DEPARTMENT<br>(in his official and individual capacity)<br>Serve: Jeffrey W. Carroll<br>Metropolitan Police Department<br>300 Indiana Avenue NW<br>Washington DC 20001<br><br>And,<br><br>The District of Columbia,<br>Serve: Attorney General for the District of<br>Columbia<br>Office of the Attorney General<br>400 6th Street, NW<br>Washington DC 20001<br><br>And,<br><br>Director Dustin Sternbeck<br>Metropolitan Police Department<br>300 Indiana Avenue NW<br>Washington DC 20001<br><br>And,<br><br>Deputy Director Kristen Metzger<br>Metropolitan Police Department<br>300 Indiana Avenue NW<br>Washington DC 20001<br><br><br>*Defendants.* | **Case No.:** |

1

## **COMPLAINT**

Comes now Complainant KARIMAH BILAL, by and through undersigned counsel, brings this action against Defendants, Chief of Police at the Metropolitan Police Department, the District of Columbia, Director Dustin Sternbeck and Deputy Director Specialist Kristen Metzger alleges as follows:

### **Jurisdiction and Venue**

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq., and the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 et seq.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

3. Venue is proper in this Court under 42 U.S.C. §2000e-(5)(f)(3) et seq., because the allegations of unlawful employment practices occurred in the District of Columbia.

### **Parties**

4. Complainant, Karimah Bilal is a resident of the District of Columbia and was employed as a CS-11 Public Affairs Specialist with MPD.

5. Defendant, Jeffery W. Carroll, Chief of the Metropolitan Police Department ("MPD") in his official capacity for the acts of his department and officers.

6. Defendant, the District of Columbia, is the municipal entity and the proper entity to be sued for the acts of its departments and officials.

7. Defendant, Deputy Director Kristen Metzger, individually, and in her official capacity as the Deputy Director of the Office of Communications and Supervisory Public Affairs Specialist of MPD.

8. Defendant, Director Dustin Sternbeck, individually, and as his capacity as the Director of the Office of Communications of MPD.

**Procedural History**

9. Complainant has diligently pursued her claims through internal EEO procedures, the Equal Employment Opportunity Commission ("EEOC"), the District of Columbia Office of Human Rights ("OHR"), and prior judicial proceedings arising out of the same nucleus of operative facts. Any applicable statute of limitations was tolled during the pendency of those administrative and judicial proceedings, including during the pendency of Complainant's prior federal action and related OHR matters.

10. Complainant filed timely administrative complaints and charges through MPD internal EEO processes, OHR, and the EEOC concerning the discriminatory, retaliatory, and unlawful conduct described herein.

11. Complainant's OHR filings included OHR Case No. 21-311-DC(N), alleging disparate treatment and failure to accommodate based on family responsibilities, and OHR Case No. 22-033-DC, alleging retaliation under the D.C. Family and Medical Leave Act ("DCFMLA").

12. OHR accepted and processed those matters, requested documentation and materials from Complainant, and continued to advise Complainant for an extended period of time that the matters remained under review and investigation.

13. Complainant further sought reopening and continued review of at least one OHR matter, and OHR advised Complainant that the matter remained under further review and investigation.

14. Complainant also filed a timely charge of discrimination with the EEOC alleging discrimination based on race, disability, and retaliation.

15. The EEOC issued a Determination and Notice of Right to Sue on or about October 29, 2024.

16. Complainant initially filed suit arising from the same underlying facts and allegations on or about January 22, 2025, within ninety (90) days of receiving the EEOC Notice of Right to Sue.

17. On or about April 15, 2025, Defendants filed a Motion to Dismiss.

18. Complainant thereafter retained counsel, who entered an appearance on or about April 28, 2025.

19. On or about July 11, 2025, the initial Complaint was dismissed without prejudice.

20. OHR later administratively dismissed certain pending OHR matters on jurisdictional overlap grounds after requesting and reviewing Complainant's federal court filings, while expressly not reaching the merits of Complainant's claims.

21. OHR further advised Complainant that her D.C. statutory claims could still be pursued through private civil action and that tolling had applied during the pendency of the OHR proceedings.

22. This action is timely filed, and any applicable limitations periods were tolled during the pendency of Complainant's administrative proceedings, prior federal action, and related agency review.

**Statement of Facts**

23. Complainant began her employment with the Metropolitan Police Department ("MPD") on or about November 30, 2015. Although she was initially hired into a lower-level civilian role as a CS-6, Complainant's duties expanded substantially over time due to her strong performance and the increasing operational needs of the Office of Communications. *See* **Exhibit 1.**

24. In June 2017, Complainant's title was officially changed to Public Affairs Specialist with MPD as a CS-9, despite performing in that capacity since December 2015. By that time and continuing thereafter, Complainant routinely performed duties beyond the formal scope of that

title, including supervisory, scheduling, administrative, audio-visual, community outreach, and program-management functions.

25. Complainant was one of the most experienced civilian employees in the Office of Communications and, over time, assumed extensive responsibilities far exceeding the formal scope of a Public Affairs Specialist position. *See* **Exhibit 26.**

26. In addition to her ordinary public affairs duties, Complainant created staff schedules; managed time and attendance functions for the Office of Communications staff; completed and submitted administrative paperwork relating to leave, FMLA, and staffing matters; handled administrative operations and recordkeeping; assisted with budget and procurement matters; coordinated office organization and staff placement; managed travel requests; and managed Director Dustin Sternbeck's ("Sternbeck"), calendar and daily operational needs.

27. Complainant also regularly performed supervisory, training, operational, and media-related responsibilities that were outside her official position description.

28. Complainant advised staff regarding media requests and public affairs procedures, guided employees on performance of daily public affairs operations, supervised interns, trained and onboarded newly hired civilian personnel and newly promoted sworn MPD employees, provided media training, recorded and edited videos, reviewed and edited body-worn camera footage, created graphics and artwork, and filled in for other supervisory or operational roles during staffing shortages or absences, including performing duties associated with the community outreach function after the prior supervisor became ill and later passed away.

29. Complainant routinely began work substantially earlier than other employees, often beginning her workday at approximately 6:30 a.m. while other staff members generally began later

in the morning. Complainant further assumed operational responsibilities during Sternbeck's absences and was relied upon for day-to-day continuity within the Office of Communications.

30. Complainant additionally performed personal-service tasks for Sternbeck that were unrelated to her official position, including chauffeuring Sternbeck, coordinating maintenance for Sternbeck's vehicle, obtaining fuel and vehicle services, and handling other personal errands that were not part of Complainant's formal job duties.

31. None of the foregoing responsibilities were reflected in Complainant's official Public Affairs Specialist position description or compensation level.

32. Upon information and belief, after Complainant's resignation, MPD redistributed Complainant's former responsibilities across multiple newly created or expanded roles, including positions associated with program management, speech writing, internal communications, visual information, and social media operations, further demonstrating that Complainant had previously been performing work substantially beyond the scope of her official title and compensation.

33. Complainant's work history, performance, and responsibilities materially exceeded the title and compensation she was given.

34. During Complainant's tenure, Sternbeck, and other management officials recognized that Complainant was effectively functioning in a Program Manager capacity. Complainant's title was changed internally to Program Manager, and her placement on the office organizational materials reflected that role, but MPD did not formalize the position or compensate Complainant accordingly. *See* **Exhibit 2a** and **Exhibit 2b.**

35. Throughout Complainant's employment, and particularly during the period relevant to this action, Complainant was supervised by Sternbeck, the Director of the Office of Communications, and Kristen Metzger ("Metzger"), Deputy Director and Supervisory Public Affairs Specialist.

36. Complainant is a Black woman and the parent of minor children, including a child with a disability.

37. Sternbeck knew of Complainant's race, family responsibilities, and her association with her disabled child.

38. Defendants benefited from Complainant performing higher-level operational and managerial responsibilities without corresponding promotion or compensation.

### A.   Hostile Work Environment, Discriminatory Animus, and Differential Treatment

39. Throughout Complainant's employment at MPD, Sternbeck engaged in repeated conduct that was racially offensive, sexually inappropriate, and hostile toward Complainant because of her race, sex, caregiving responsibilities, and association with her disabled child.

40. Sternbeck made various sexually explicit comments in the workplace about interns, interviewees, and people not affiliated with MPD while on the job.

41. Sternbeck also made sexually explicit comments about female interns, interviewees, and coworkers, including comments about their bodies and sexually suggestive jokes.

42. Sternbeck made lewd comments directly to Complainant, including telling her to "rub his feet" and "sit right here [his lap]." *See* **Exhibit 3.**

43. On or about September 17, 2018, Sternbeck created a sexually explicit image out of Halloween decorations near Complainant's desk depicting a ghost inserting a black penis into a pumpkin's mouth. *See* **Exhibit 4.**

44. Various other MPD employees joked about reporting Sternbeck for sexual harassment, reflecting that his conduct was known within the office and not isolated. *See* **Exhibit 3**.

45. Sternbeck made repeated racially charged remarks and comments reflecting hostility toward Black employees and Black communities.

46. Complainant was subjected to those comments directly and also observed that Sternbeck treated Black employees differently than non-Black employees in work assignments, advancement, and office treatment.

47. Sternbeck disproportionately assigned Black employees tasks outside the scope of their official job duties while assigning more visible, substantive, or career-advancing work to non-Black employees.

48. From approximately 2016 through 2019, Complainant was not merely performing her assigned duties at MPD but was also expected to perform personal errands and personal-service tasks for Sternbeck. *See* **Exhibit 3.**

49. Those personal tasks included getting Sternbeck's work vehicle washed, vacuumed, fueled, and maintenance, picking up lunch outside the District, and chauffeuring Sternbeck for personal errands. *See* **Exhibit 3.**

50. Upon information and belief, white employees were not regularly required to perform these personal tasks for Sternbeck.

51. When Complainant ceased performing Sternbeck's personal errands, Sternbeck began excluding her from workplace communications, opportunities and assignments. *See* **Exhibit 5**.

52. Sternbeck's discriminatory and hostile behavior also extended to Complainant's child with a disability. Sternbeck made comments regarding Complainant's disabled child, mocked Complainant's need for flexibility and caregiving support, and treated her child's disability as a burden to the office.

53. In or about April 2020, Sternbeck exclaimed, "Oh my God! What is that?" in reference to Complainant's special-needs child. *See* **Exhibit 6.**

54. Sternbeck further minimized and mocked the impact of Complainant's child's disability and repeatedly treated Complainant's caregiving obligations as illegitimate, inconvenient, or undeserving of accommodation or flexibility.

55. Sternbeck also suggested that Complainant's child's autism made Complainant's schedule "unpredictable," and he used that asserted rationale as a basis to remove Complainant's work responsibilities and deny her access to telework and core job functions. *See* **Exhibit 7, pp. 80.**

56. Sternbeck's comments and conduct were not abstract workplace slights. They reflected discriminatory animus and were tied to subsequent adverse actions affecting Complainant's compensation, duties, telework status, evaluations, communications, and working conditions.

### B.  Unequal Pay, Comparator Evidence, and Denial of Promotion

57. Despite Complainant's experience, seniority, and responsibilities, Complainant remained compensated at a lower pay grade (Grade 9) than non-black employees whom she trained or supervised.

58. A white employee, Alaina Gertz ("Gertz"), whom Complainant had supervised as an intern, was later offered a 13-month term position by Sternbeck at a Grade 11 on the pay scale.

59. At the same time, Complainant, who had trained Gertz and was performing substantially greater responsibilities, remained at a lower pay grade.

60. Gertz did not have Complainant's level of experience, seniority, office responsibility, or institutional knowledge. Nonetheless, Gertz was compensated more favorably and advanced more quickly than Complainant.

61. Once Gertz's term was nearing expiration, she was positioned to receive further advancement, including an offer of a Grade 12 promotion, despite objections from Black Public Affairs Specialists who viewed the disparity as unfair and racially motivated.

9

62. Complainant, by contrast, had been performing Program Manager-level work for years, yet was denied the corresponding title formalization, pay, and promotion.

63. On or about March 13, 2020, Complainant met with Sternbeck regarding her promotion, at which point Sternbeck concluded that he needed more time to consider whether Complainant deserved a promotion. *See* **Exhibit 8**.

64. On or about March 19, 2020, Complainant sent a follow up email to Sternbeck regarding her promotion. *Id.*

65. On or about March 24, 2020, Complainant sent a second follow up email to Sternbeck and received no response. *Id.*

66. On or about June 8, 2020, Complainant again followed up with Sternbeck regarding her promotion. *Id.*

67. On or about June 8, 2020, Sternbeck responded to Complainant's email that he would schedule a meeting with Complainant and Deputy Director of the Office of Communications, Kristen Metzger ("Metzger"). *Id.*

68. On or about June 11, 2020, Complainant met with Sternbeck and Metzger regarding the promotion. At that meeting, Sternbeck denied Complainant the requested advancement to the Program Manager role, despite her qualifications, years of actual performance in that role, and prior internal recognition of those responsibilities.

69. During that same period, Sternbeck and management praised Complainant's high-level performance, her strong work ethic, and reputation. *See* **Exhibit 2a** and **Exhibit 2b**.

70. Notwithstanding that praise, Sternbeck informed Complainant that she did not "deserve" a promotion. *See* **Exhibit 8.**

71. Sternbeck also relied on a purported city-wide promotional freeze as a justification for denying Complainant's advancement, even though that rationale was inconsistent with the office's treatment of non-Black employees and the ongoing advancement of less-qualified white personnel.

72. Upon information and belief, white employees in the same office continued to receive raises, promotions, preferential treatment, and work opportunities during this same period.

73. Sternbeck's denial of Complainant's promotion occurred after Complainant had raised concerns relating to her family responsibilities during the COVID-19 period and after Complainant had ceased performing Sternbeck's personal errands, further supporting an inference that the denial was discriminatory and retaliatory rather than merit-based.

74. After Complainant's promotion denial, union representatives reached out to Complainant. Complainant had not initially brought the matter to the union as a promotion grievance; rather, the union became involved after Sternbeck, and others began characterizing Complainant unfairly and damaging her standing in the workplace.

### C. Telework, Family Responsibilities, and Associational Disability Retaliation and Failure to Accommodate

75. Complainant requested leave for Eid and for the care of her disabled child, which Sternbeck mocked and denied.

76. In early 2020, the COVID-19 pandemic materially changed office operations for MPD civilian personnel, including within the Office of Communications.

77. Telework was not an ad hoc or imaginary arrangement. It was an established practice for civilian personnel in Complainant's office prior to the pandemic and became even more formalized during the pandemic.

78. Prior to and during the pandemic, teleworking was common practice for Complainant and other civilian employees in the Office of Communications.

11

79. Mayor Bowser issued an Order requiring non-essential employees to telework during the relevant COVID-19 period. *See* **Exhibit 9.**

80. Complainant signed a teleworking agreement approved by the Chief of Police on March 13, 2020. *See* **Exhibit 10.**

81. Complainant therefore had an actual, documented, and approved telework arrangement during the relevant period, and telework was a real and recognized condition of her employment and that of similarly situated civilian staff.

82. Complainant's need for telework and schedule stability became especially important during the pandemic because she was caring for minor children, including a child with a disability, during school and daycare disruptions.

83. On or about April 6, 2020, Complainant sent an email to Metzger and other colleagues regarding distance learning, work demands, and scheduling. *See* **Exhibit 11.**

84. After that email, Complainant called Sternbeck, and Sternbeck told her she should not be an "exception" and that she should not be emailing "things like that," referring to her caregiving concerns and family responsibilities. Sternbeck then directed Complainant to schedule an emergency office meeting regarding COVID-19 work expectations. *See* **Exhibit 3.**

85. Complainant alleges that this interaction marked a significant turning point in Sternbeck's treatment of her. After Complainant disclosed the practical realities of caring for her children during the pandemic, Sternbeck increasingly treated her family responsibilities as a workplace problem and began instituting obstacles that disproportionately and foreseeably burdened Complainant.

86. From June 2020 until April 2021, MPD failed to provide reasonable accommodations for Complainant and her disabled child. *See* **Exhibit 12a, 12b, 12c**, and **12d**.

12

87. On or about June 4, 2020, during an in-person meeting regarding scheduling, Complainant informed them that she could not work on her scheduled day-off due to childcare issues. *See* **Exhibit 3**.

88. Complainant was then informed that she had to go to work on that day, bringing her total consecutive days worked to thirteen (13) with no days off. *See* **Exhibit 13**.

89. On or about June 16, 2020, on Complainant's third consecutive day of leave, she received an email from Metzger that she would violate her Union agreement if she used another day of leave. *See* **Exhibit 14**.

90. That same day, Sternbeck began delegating Complainant's tasks to other employees.

91. On or about June 17, 2020, Complainant texted with Metzger and they asked if she could talk.

92. During this period, Sternbeck and Metzger were aware that Complainant needed flexibility to care for her disabled child, but instead of supporting that need, they began using it as a reason to sideline Complainant, interfere with her duties, and challenge her value to the office.

93. On or about June 23, 2020, Complainant raised concerns to Chief of Staff for the Executive Office of the Chief of Police Matthew Bromeland ("Bromeland"), about Sternbeck's increasingly hostile behavior, the office environment, and discriminatory treatment.

94. Bromeland advised if Complainant discussed any EEO matters, it needed to be formally reported, and no corrective action was taken. *See* **Exhibit 15**.

95. After Complainant filed an internal EEO Complaint on August 25, 2020, she was excluded from staff emails, conference calls and assignments after being told she would be kept in the loop. *See* **Exhibit 16.**

96. On or about June 26, 2020, Sternbeck had individual conversations with the staff in the office to speak to them as people and not just employees following his discussion with Bromeland. *See* **Exhibit 3.**

97. Complainant expressed that Sternbeck's behavior negatively affected the work environment and asked for time-off to assist her child with distant-learning.

98. Sternbeck mocked her child's disability, minimized her family's needs, and treated her disparately for requesting reasonable accommodation, for her child's condition and her caregiver role. *See* **Exhibit 6**.

99. Sternbeck further alleged to Complainant that her autistic child makes her schedule unpredictable and that she was no longer valuable to the team.

100.    Sternbeck suggested Complainant do lower-level work outside of her established duties, including to archive VHS tapes and CDs in the basement of the police academy, thereby attempting to remove her from the higher-level responsibilities she had been performing.

101.    On or about July 2, 2020, Complainant received Paid Family Leave ("PFL") and Family Medical Leave Act ("FMLA") for her special needs child. *See* **Exhibit 17**.

102.    Sternbeck had previously suggested Complainant would not qualify for such benefits and continued to interfere in or scrutinize Complainant's use of leave after it was approved.

103.    On or about July 8, 2020, Complainant had a mid-year review with Metzger where they discussed Sternbeck's behavior towards her. *See* **Exhibit 18a** and **18b**.

104.    The final yearly performance evaluation was Complainant's first negative review in her tenure at MPD. *See* **Exhibit 18b**.

105.    During that meeting, Complainant submitted a leave request stating that she would utilize restored leave instead of PFL to assist with her child's therapy sessions during that time.

106.    Sternbeck responded that he would have to follow up with HR.

107.    Complainant informed Sternbeck that it was not an HR issue, and she was using restored leave for time off and PFL reasoning is confidential.  *See* **Exhibit 19**

108.    On or about July 9, 2020, Complainant sent a follow-up email regarding her leave request to which Sternbeck responded that they would be following up with HR. *See* **Exhibit 19.**

109.    On or about July 14, 2020, Complainant received a call from Metzger informing her that her leave was approved and there was no issue with HR in using restored leave.

110.    On or about July 16, 2020, Metzger agreed with the Complainant in a phone call, that Sternbeck was retaliating against her for taking leave for her disabled child.

111.    On or about July 28, 2020, Complainant sent a message about using sick leave on August 3, 2020. *See* **Exhibit 3.**

112.    On or about July 29, 2020, Complainant received another email from Metzger during her time off requesting her time sheet and advised that Metzger would assume time and attendance duties previously handled by Complainant. *See* **Exhibit 3.**

113.    The email exchange falsely alleged that Complainant's time off had not been approved, prompting Complaint to send leave slips that had in fact been signed by Sternbeck. *See* **Exhibit 3**.

114.    On or about July 30, 2020, Complainant received an email from Metzger that MPD was having a required in-person meeting. *See* **Exhibit 3.**

115.    On or about August 3, 2020, Complainant spoke on the phone with Metzger and informed that she could not be physically in the office daily due to issues with her children and requested telework.

116.    Rather than work with Complainant to preserve her ability to continue performing her job through telework, Defendant increasingly treated telework as a privilege to be withheld from Complainant, even while allowing it for others.

117.    Kevin Palmer, a white male employee under Sternbeck's supervision, was permitted to telework for an extended period, including before, during, and after the pandemic period, due to family-related circumstances.

118.    Other employees without Complainant's caregiving burdens or without a disabled child were permitted telework or were otherwise treated more flexibly and favorably than Complainant.

119.    Complainant, by contrast, was denied telework after disclosing the extent of her child's disability-related needs and after Sternbeck began using Complainant's caregiving responsibilities as a basis to question her reliability.

120.    On or about August 10, 2020, Complainant advised Metzger that she would be teleworking her next day. Metzger informed her that Sternbeck was going to hold a meeting about disallowing telework for any civilian MPD PIO staff. *See* **Exhibit 3.**

121.    During that meeting, Sternbeck announced to the staff that Complainant was relieved of her duties and would no longer be creating the office schedules due to her allegedly "unpredictable" schedule. *See* **Exhibit 7, pp. 80.**

122.    Sternbeck further announced that another staff member would have to work Complainant's shift and telework was no longer allowed (for Complainant).

123. Sternbeck's stated rationale was directly tied to Complainant's known caregiving responsibilities and his assumption that her association with her disabled child rendered her unreliable or less useful to the office.

124. On or about August 11, 2020, Complainant attempted to schedule a meeting with Sternbeck, but Sternbeck stated that he felt there was nothing to discuss.

125. During the ensuing meeting on or about August 12, 2020, Complainant asked how she would be able to assist her children with distant learning, why her job duties were revoked, and why some employees were allowed to telework, but she was not. Sternbeck did not meaningfully answer those questions, and Metzger instead responded.

126. Sternbeck's removal of Complainant's duties, denial of telework, and refusal to restore her job functions were not isolated workplace inconveniences. They altered her work responsibilities, reduced her role, interfered with her ability to perform the job she had long performed, and increased the pressure on her to exhaust leave or stop working.

### D. Internal Complaint, Retaliation, and Escalation

127. On or about August 13, 2020, Complainant received a call from the Union President, Harvey Cannon ("Cannon") who advised that he had received a call from the Director of Professional Development Bureau, Marvin Haiman ("Haiman"), informing Cannon that Complainant was creating schedules improperly, abusing leave, and not doing her job.

128. Complainant informed Cannon that Sternbeck was targeting her and that those accusations were patently false.

129. On or about August 25, 2020, Complainant filed an internal EEO complaint alleging discrimination based on race and family responsibilities. *See* **Exhibit 21.**

130. After Complainant engaged in this protected activity, Defendant escalated its retaliatory conduct.

131. After filing the internal EEO complaint, Complainant was excluded from staff emails, conference calls, assignments, and work communications, despite having previously been told that she would be kept in the loop. *See* **Exhibit 16.**

132. On or about October 23, 2020, Complainant learned that she had been excluded from all staff text messages, emails, conference calls, and all other communications.

133. That same day, Complainant was issued an Exit Letter and notified that EEOID would continue its efforts. *See* **Exhibit 7, pp. 2.**

134. Since August 2020, Sternbeck had little to no direct communication with Complainant and denied or ignored her continued requests for telework.

135. Metzger communicated with Complainant only sporadically, primarily in response to administrative matters, such as leave extensions.

136. On or about November 20, 2020, after Complainant had filed her complaint, Complainant received a negative performance evaluation score for the first time after years of satisfactory and strong evaluations. *See* **Exhibit 18b.**

137. That lowered evaluation was not merely insulting. It represented a break from Complainant's prior performance history and carried adverse career and financial consequences, including interference with pay progression and future employment opportunities.

138. Between November 30, 2020, and December 4, 2020, Complainant's passwords to shared work accounts were changed without her knowledge.

139. Complainant requested the new passwords, but her requests were denied. *See* **Exhibit 3**.

140.    On or about December 17, 2020, Complainant sent an email to Sternbeck and Metzger asking about telework denial and the changed passwords. *See* **Exhibit 22a** and **Exhibit 22b**.

141.    Those inquiries remained ignored.

142.    Sternbeck also detailed a sworn officer into the communications office and had them permanently stationed at Complainant's cubicle.

143.    Complainant had occupied that cubicle during her tenure at MPD, and Defendant's reassignment of that space while Complainant was still an employee further reflected Defendant's intention to displace Complainant from the office and sever her role.

144.    On or about December 29, 2020, all staff were permitted to telework after a COVID-19 outbreak which was likely caused by an in-person office party.

145.    Telework was still not extended to Complainant.

146.    Sternbeck sent an email to the entire staff at the end of the year thanking them for their work and contributions for the year 2020 and excluded Complainant from that communication. *See* **Exhibit 5.**

147.    On or about January 6, 2021, Complainant sent an email requesting leave extension and received no response. *See* **Exhibit 23.**

148.    On or about January 11, 2021, Complainant sent a follow up email regarding her leave request, and Metzger replied "approved" later that afternoon. *See* **Exhibit 23.**

149.    Between March 13, 2021, and August 13, 2021, Sternbeck rarely communicated with Complainant and left several emails unanswered.

150.    Sternbeck changed policies in order to cause disruption in Complainant's schedule.

19

151.    Sternbeck frequently changed Complainant's schedule with little notice and altered office practices in ways that disproportionately disrupted Complainant's ability to work while managing known caregiving responsibilities. *See* **Exhibit 24.**

152.    Sternbeck removed Complainant from programs, reassigned her job duties to her supervisor, and sidelined her role without informing her in advance. *See* **Exhibit 25.**

### E.  Interference With Administrative Proceedings

153.    During the pendency of Complainant's internal EEO, OHR, and EEOC proceedings, Defendants, including Sternbeck and Metzger, participated in responding to administrative inquiries and providing information concerning Complainant's allegations and employment history.

154.    Complainant alleges that Defendants continued advancing narratives during the administrative process that Complainant was improperly utilizing leave, mishandling scheduling responsibilities, or failing to perform her duties, despite Complainant's documented performance history, approved leave status, and years of expanded responsibility within the Office of Communications.

155.    Complainant further alleges that many of the same accusations used internally to justify stripping Complainant of duties and limiting her role were later repeated during administrative proceedings in an effort to undermine Complainant's credibility and minimize her discrimination and retaliation claims.

156.    During the administrative proceedings, Complainant repeatedly provided supporting documentation, communications, leave records, internal emails, organizational materials, and other evidence corroborating her claims and rebutting Defendants' asserted justifications.

157.     Despite Complainant's repeated submissions and cooperation, the administrative proceedings became increasingly prolonged and procedurally delayed.

158.     Complainant alleges that Defendants contributed to those delays by disputing documented facts, advancing inconsistent characterizations of Complainant's work performance and leave usage, and requiring repeated responses during the administrative review process.

159.     Complainant further alleges that Defendants repeatedly characterized Complainant's protected leave usage and telework requests as evidence of unreliability or diminished value to the office, despite those requests being directly connected to Complainant's caregiving responsibilities for her disabled child.

160.     The retaliatory and discriminatory conduct alleged herein therefore extended beyond the workplace itself and continued during the pendency of Complainant's administrative proceedings.

161.     Complainant also experienced significant procedural irregularities during the OHR process. OHR continued representing to Complainant that her matters remained under review and investigation for an extended period of time, including communications occurring years after the original filings.

162.     In or about 2025, OHR requested copies of Complainant's federal complaint and related federal filings while Complainant's federal action was pending.

163.     Shortly after Complainant provided those materials, OHR administratively dismissed the pending matters on jurisdictional grounds, asserting that the allegations substantially overlapped with those raised in federal court.

164.    OHR's dismissal was not based upon a finding that Complainant's claims lacked merit, nor did OHR issue any merits determination rejecting Complainant's allegations of discrimination, retaliation, family-responsibilities discrimination, or leave-related retaliation.

165.    OHR further stated that the D.C. Human Rights Act claims had been dismissed without a merits determination and could be pursued through a private cause of action in D.C. Superior Court, and that the DCFMLA claims likewise could be pursued privately. OHR also advised that tolling had applied while those matters were pending.

166.    OHR initially failed to provide Complainant with notice of the administrative dismissal and later acknowledged by email that Complainant had inadvertently not been copied on the original dismissal notification.

167.    Complainant continued to pursue her rights diligently across forums and did not abandon her claims. Rather, Complainant consistently sought review, clarification, and resolution of her claims through MPD, OHR, and EEOC processes while also attempting to preserve them in court.

### F.    Resignation and Resulting Harm

168.    By April 2021, Complainant had exhausted available leave and workplace remedies while continuing to face discrimination, exclusion, leave interference, stripped duties, denial of telework, and a work environment rendered intolerable by Sternbeck's and Defendant's conduct.

169.    Complainant's resignation was not the product of an ordinary workplace disagreement or isolated inconvenience. It followed a sustained pattern of discriminatory and retaliatory conduct that effectively deprived Complainant of the ability to continue functioning in her role.

22

170. Defendant's actions forced Complainant to resign in order to avoid further financial hardship, emotional harm, and deterioration of her employment situation.

171. As a direct and proximate result of Defendant's conduct, Complainant suffered lost compensation, lost advancement opportunities, professional injury, emotional distress, and other damages.

### <u>Count I—Race Discrimination (Title VII, 42 U.S.C. §2000e et seq.)</u>
**[Against Defendant District of Columbia]**

172. Complainant incorporates by reference all preceding paragraphs in Complaint.

173. Title VII prohibits an employer from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment because of such individual's race.

174. To establish a claim for race discrimination under Title VII, Complainant must show that she is a member of a protected class, that she was qualified for her position, that she suffered a materially adverse employment action, and that the action occurred under circumstances giving rise to an inference of discrimination.

175. At all relevant times, Defendants were employers within the meaning of Title VII and were subject to its provisions.

176. Complainant is a Black woman and therefore a member of a protected class under Title VII.

177. At all relevant times throughout her employment, Complainant was qualified for her position.

178. As alleged above, Complainant had years of successful service with MPD, performed work beyond her formal title, carried supervisory and program-management responsibilities, and was internally recognized as functioning in a higher-level role.

179. Complainant's performance was repeatedly praised by management, including Sternbeck, who acknowledged her strong work ethic and reputation even while denying her advancement.

180. These allegations establish that Complainant was performing at a level sufficient to meet and exceed Defendants' legitimate expectations.

181. Complainant suffered multiple materially adverse employment actions affecting the terms, conditions, and privileges of her employment.

182. These included the denial of promotion to a Program Manager role that Complainant had effectively been performing for years, the maintenance of Complainant at a lower pay grade than less experienced employees, the removal of core job duties, the denial of telework that was otherwise available within the office, the issuance of a negative performance evaluation after years of positive evaluations, and the progressive reduction of Complainant's role within the Office of Communications.

183. The circumstances surrounding these actions give rise to a strong inference of race discrimination.

184. Complainant alleges that similarly situated non-Black employees were treated more favorably in compensation, advancement, and workplace flexibility.

185. In particular, Complainant alleges that Alaina Gertz, a white employee whom Complainant supervised and trained, was offered a higher-grade position and positioned for further advancement despite having less experience, less responsibility, and less institutional knowledge than Complainant.

186.    Complainant further alleges that white employees were not required to perform personal errands for Sternbeck and were not subjected to the same demeaning or non-career-enhancing assignments imposed on Complainant.

187.    Complainant also alleges that Sternbeck treated Black employees differently as a group, including by disproportionately assigning them tasks outside their official job duties while reserving more visible, substantive, and career-advancing work for non-Black employees.

188.    This pattern of differential treatment provides additional support for an inference of discriminatory intent.

189.    Complainant further alleges that Sternbeck made racially charged remarks and exhibited hostility toward Black employees and Black communities, and that this discriminatory animus was reflected in his management decisions affecting Complainant's assignments, advancement, and workplace treatment.

190.    The denial of Complainant's promotion and other adverse actions were not based on legitimate, non-discriminatory reasons.

191.    Defendants' proffered explanations for their actions were not legitimate and were pretextual. For example, Sternbeck relied on a purported city-wide promotional freeze to deny Complainant's advancement, yet Complainant alleges that non-Black employees continued to receive raises, promotions, or preferential treatment during the same period.

192.    Defendants benefited from Complainant performing higher-level managerial and operational responsibilities without providing corresponding compensation or advancement.

193.    This inconsistency supports the inference that the stated justification was not the true reason for the adverse action.

194.    The sequence of events further supports discriminatory intent.

195.    Complainant alleges that after she ceased performing personal errands for Sternbeck and after she asserted her professional role within the office, Sternbeck began excluding her from communications, limiting her opportunities, and denying advancement.

196.    This shift in treatment, when viewed alongside the comparator evidence and racially disparate practices, supports the inference that Complainant's race was a motivating factor in Defendants' actions.

197.    Taken together, the allegations demonstrate that Defendants treated Complainant less favorably than similarly situated non-Black employees in compensation, advancement, job duties, and workplace opportunities, and that such treatment was motivated, at least in part, by race.

198.    Defendants therefore discriminated against Complainant with respect to the terms, conditions, and privileges of her employment because of her race, in violation of Title VII.

199.    As a direct and proximate result of Defendants' unlawful conduct, Complainant suffered lost wages, lost promotional opportunities, professional harm, emotional distress, and other damages.

### Count II—Retaliation in Violation of Title VII (42 U.S.C. §2000e et seq.)
**[Against Defendant District of Columbia]**

200.    Complainant incorporates by reference all preceding paragraphs in Complaint.

201.    Title VII prohibits an employer from retaliating against an employee because she has opposed any practice made unlawful by Title VII or has made a charge, testified, assisted, or participated in an investigation or proceeding under Title VII.

202.    To establish a claim for retaliation, Complainant must show that she engaged in protected activity, that she suffered a materially adverse action, and that there is a causal connection between the protected activity and the adverse action.

203.    Complainant engaged in protected activity by opposing discriminatory conduct within the workplace and by formally filing an internal Equal Employment Opportunity complaint on or about August 25, 2020.

204.    Prior to that filing, Complainant also raised concerns regarding bias, hostile behavior, and discriminatory treatment within the Office of Communications, including raising concerns to senior leadership.

205.    At the time Complainant engaged in this protected activity, Defendants were aware of her complaints and her opposition to discriminatory conduct.

206.    Complainant's complaints were made directly to supervisory and leadership personnel, including Sternbeck and Bromeland, and the internal EEO complaint was formally lodged within MPD, placing Defendants on notice of Complainant's opposition to unlawful practices.

207.    Following Complainant's protected activity, Defendants subjected Complainant to a series of materially adverse actions that would dissuade a reasonable employee from engaging in protected activity.

208.    These actions included excluding Complainant from staff emails, meetings, conference calls, and workplace communications; stripping her of her core job duties and reassigning them to others; denying Complainant access to telework while permitting it for others; issuing Complainant her first negative performance evaluation after years of positive evaluations; denying Complainant access to work systems by changing passwords; ignoring her work-related inquiries; and otherwise isolating her within the workplace

209.    These actions were materially adverse because they directly affected Complainant's ability to perform her job, maintain her professional standing, and continue her employment, and

27

because they would deter a reasonable employee from making or supporting a discrimination complaint.

210. The adverse actions were causally connected to Complainant's protected activity.

211. Complainant alleges that the escalation in Defendants' conduct occurred after she filed her internal EEO complaint.

212. While Defendants had already engaged in discriminatory conduct, the nature and severity of the actions intensified after Complainant's protected activity, shifting from differential treatment to systematic exclusion, isolation, and professional undermining.

213. The timing of these actions supports an inference of causation.

214. Complainant alleges that she was excluded from communications, stripped of duties, and subjected to adverse treatment shortly after filing her internal complaint.

215. Defendants' retaliatory conduct continued even after Complainant sought administrative relief, including through positions taken and actions occurring during internal EEO, OHR, and EEOC proceedings.

216. This temporal proximity, combined with the pattern of escalating conduct, supports the inference that the adverse actions were taken because of Complainant's protected activity.

217. The causal connection is further supported by the broader context of Defendants' conduct.

218. Complainant alleges that Sternbeck reacted negatively to Complainant's assertions of her rights and her refusal to acquiesce to improper treatment, and that Defendants thereafter took steps to marginalize Complainant within the office and diminish her role.

219. Defendants' actions were not based on legitimate, non-retaliatory reasons. Complainant had a documented history of strong performance, and the adverse actions taken

28

against her, including exclusion from communications, denial of telework, and stripping of duties, were inconsistent with any claim of performance deficiency and instead reflect retaliatory motive.

220.    Defendants therefore retaliated against Complainant for engaging in protected activity in violation of Title VII.

221.    As a direct and proximate result of Defendants' retaliatory conduct, Complainant suffered economic losses, damage to her career, emotional distress, and other damages.

### Count III—Disability Discrimination (Associational) in Violation of the ADA
### (42 U.S.C. § 12101 et seq) [Against Defendant District of Columbia]

222.    Complainant incorporates by reference all preceding paragraphs in Complaint.

223.    At all relevant times, Defendants were employers within the meaning of the Americans with Disabilities Act and were subject to its provisions.

224.    The ADA prohibits an employer from discriminating against a qualified employee because of the known disability of an individual with whom the employee is known to have a relationship or association.

225.    To state and prove such a claim, Complainant must show that she was qualified for her position, that Defendants knew she was associated with an individual with a disability, that she suffered adverse employment actions or was denied equal jobs or benefits, and that the adverse actions were taken because of that known association.

226.    Complainant was, at all relevant times, qualified for her position. As alleged above, Complainant had years of successful service at MPD, performed work well beyond the formal scope of her Public Affairs Specialist title, handled administrative, scheduling, supervisory, media-relations, and program-management functions, and was internally recognized as operating in a Program Manager capacity.

29

227. Sternbeck and management praised Complainant's high-level performance, work ethic, and reputation even while refusing to promote her.

228. Those allegations establish that Complainant was not an underperforming employee and was capable of performing the essential functions of her position and the higher-level role she had already been carrying out.

229. Defendants knew that Complainant had a child with a disability and knew that Complainant was the parent and caregiver for that child.

230. Complainant repeatedly informed management of her caregiving obligations during the pandemic, sought leave related to her child's condition, received approved PFL and FMLA related to her special-needs child, and discussed the impact of her child's needs with Sternbeck and Metzger.

231. More than that, Sternbeck's own conduct confirms his knowledge because he directly referenced Complainant's child, mocked the child, and repeatedly linked Complainant's value and schedule to the child's condition.

232. Complainant suffered adverse employment actions and denials of equal jobs and benefits after Defendants knew of Complainant's association with her disabled child.

233. Those actions included denial and revocation of telework, stripping Complainant of scheduling and timekeeping duties, removal from programs and core functions, interference with leave, refusal to meaningfully respond to Complainant's requests for work-preserving flexibility, the issuance of a negative performance evaluation after years of strong evaluations, exclusion from communications and work systems, and the ultimate reduction of Complainant's role to the point that resignation became unavoidable.

234. The facts alleged support a plausible and strong inference that those actions were taken because of Complainant's association with her disabled child, rather than for any legitimate performance-based reason.

235. Sternbeck did not simply deny a generic scheduling request. Complainant alleges that Sternbeck mocked her child directly, referred to her child in degrading terms, repeatedly treated Complainant's caregiving obligations as illegitimate or inconvenient, and affirmatively framed Complainant's child's autism as the reason Complainant's schedule was "unpredictable."

236. Complainant further alleges that Sternbeck used that asserted "unpredictability" as the basis to revoke telework, remove duties, reduce Complainant's office role, and justify treating her as less valuable to the team.

237. Those are not neutral workplace observations; they are allegations that Defendants drew adverse employment conclusions from Complainant's known relationship with a disabled child.

238. This is precisely the type of discriminatory conduct prohibited by § 12112(b)(4). The ADA's associational provision exists to prevent employers from making decisions based on stereotypes, assumptions, or hostility regarding an employee's relationship to a disabled person.

239. Complainant has alleged that Sternbeck assumed that because Complainant's child was autistic, Complainant would be unreliable, less available, and less worthy of telework, promotion, and continued core duties. Complainant has also alleged that Defendants acted on those assumptions by materially reducing Complainant's role and denying her equal workplace benefits.

240. The causal connection is strengthened by timing and sequence.

241. Complainant alleges that Sternbeck's treatment worsened after Complainant disclosed and emphasized the realities of caring for her disabled child during the pandemic, after

Complainant sought leave related to that child, and after Complainant attempted to preserve her employment through telework.

242. The allegations show that, as Complainant's association with her disabled child became more salient to management, Sternbeck escalated the denial of telework, the stripping of duties, the scrutiny of leave, and the disparagement of Complainant's role.

243. Comparator facts further support the claim. Complainant alleges that other employees who did not share her association with a disabled child, including employees without her caregiving burdens and employees who were childless or otherwise differently situated, were permitted telework and treated with greater flexibility.

244. Complainant also alleges that Kevin Palmer, a white male employee under Sternbeck's supervision, was permitted extended telework, including before, during, and after the pandemic period.

245. Those allegations support the inference that Defendants did not view telework or flexibility as categorically unavailable, but rather selectively withheld it from Complainant after associating her child's disability with diminished value and reliability.

246. Defendants' conduct therefore constituted discrimination against Complainant because of the known disability of an individual with whom Complainant had a relationship or association, in violation of the ADA.

247. As a direct and proximate result of Defendants' conduct, Complainant suffered loss of income, loss of advancement opportunities, emotional distress, reputational injury, and other compensable damages.

### Count IV—Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)) [Against Defendant District of Columbia]

248. Complainant incorporates by reference all preceding paragraphs in Complaint.

32

249.    Title VII prohibits discrimination with respect to the compensation, terms, conditions, and privileges of employment because of race and sex.

250.    A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.

251.    To establish a hostile work environment claim, Complainant must show that she was subjected to unwelcome conduct, that the conduct occurred because of a protected characteristic, that the conduct was severe or pervasive enough to alter the conditions of employment and create an abusive work environment, and that there is a basis for employer liability.

252.    Here Complainant was subjected to unwelcome conduct. The conduct described in the factual section was not invited, welcomed, or consensual.

253.    Sternbeck made sexually explicit comments in the workplace about interns, interviewees, and other women; directed lewd comments to Complainant herself, including telling her to "rub his feet" and to sit on his lap; created a sexually explicit display near the Complainant's desk using office materials; made racially charged remarks and displayed hostility toward Black employees; assigned Black employees demeaning or non-career-enhancing tasks; and required Complainant to perform personal errands and personal-service tasks for him that were not part of her official job.

254.    Those allegations are sufficient to establish that the conduct was unwanted and degrading.

255.    The conduct occurred because of Complainant's race and sex.

33

256.     Complainant has not merely alleged general incivility. She alleges that Sternbeck sexualized women in the workplace, directed sexually inappropriate remarks at Complainant, and created a sexually explicit workplace display near Complainant's desk. She also alleges that Sternbeck treated Black employees differently in assignments and advancement, disproportionately relegated Black employees to tasks outside their official roles and denied Complainant opportunities while more favorably treating non-Black employees. The complaint thus ties the offensive conduct to protected characteristics rather than presenting it as personality conflict or ordinary office friction.

257.     The conduct was severe and pervasive.

258.     It was severe because it involved sexualized statements from a supervisor, sexual humiliation in the workplace, racially charged remarks, racialized disparities in assignments and advancement, and repeated misuse of supervisory authority to demean and control Complainant.

259.     It was pervasive because it occurred over an extended period of years, was not limited to a single incident, and was known in the office to the point that other employees joked about reporting Sternbeck for sexual harassment.

260.     Complainant was thus required to work in an environment where sexual degradation, racial hostility, and discriminatory treatment were persistent features of her employment.

261.     The conduct altered the terms and conditions of Complainant's employment.

262.     Complainant does not allege merely that she was offended; she alleges that Sternbeck's race- and sex-based hostility translated into the structure of her work life. She was singled out for demeaning tasks, denied advancement, excluded from opportunities, compelled to

34

perform personal errands, and subjected to ongoing humiliation and hostility by the very supervisor who controlled her assignments and advancement.

263. The harassment therefore operated both as abusive conduct and as a mechanism through which Complainant's professional standing and working conditions were degraded.

264. There is a basis for employer liability. Sternbeck was Complainant's supervisor and Director of the Office of Communications. His conduct was therefore undertaken with supervisory authority over Complainant's work, assignments, and advancement.

265. Defendants are liable because the hostile conduct was perpetrated by a supervisor and because the office environment was sufficiently aware of Sternbeck's conduct that it cannot plausibly be characterized as hidden or isolated.

266. Defendants therefore subjected Complainant to a hostile work environment because of race and sex in violation of Title VII.

267. As a direct and proximate result of this hostile work environment, Complainant suffered emotional distress, humiliation, interference with her employment, and other damages.

<u>**Count V— Constructive Discharge**</u>
**[Against Defendant District of Columbia]**

268. Complainant incorporates by reference all preceding paragraphs in Complaint.

269. Constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that a reasonable person in the employee's position would feel compelled to resign.

270. To establish constructive discharge, Complainant must show that she was subjected to unlawful discriminatory or retaliatory conduct, that her working conditions became objectively intolerable, and that those conditions effectively forced her resignation.

35

271.     Complainant was subjected to unlawful discriminatory and retaliatory conduct, as alleged throughout the complaint. Complainant alleges race discrimination, associational disability discrimination, retaliation after protected activity, discriminatory denial of telework and duties, interference with leave, exclusion from workplace systems and communications, and a hostile work environment under the authority of her supervisor.

272.     Complainant's working conditions became objectively intolerable. This is not a case involving mere workplace annoyance, criticism, or ordinary friction.

273.     Complainant alleges that she was denied the promotion corresponding to the work she had already been performing, denied telework despite an actual and approved telework arrangement, stripped of central job duties because of her allegedly "unpredictable" schedule, excluded from communications and shared systems necessary to perform her job, given a negative performance evaluation after years of strong evaluations, subjected to leave scrutiny and obstruction, displaced from her physical workspace, and effectively treated as someone no longer welcome in the office.

274.     She further alleges that all of this occurred against a backdrop of sexualized remarks, racially charged conduct, hostility toward her disabled child, and retaliatory escalation after she filed an internal EEO complaint.

275.     These conditions would be considered intolerable to a reasonable employee in Complainant's position. A reasonable employee who had been deprived of meaningful work functions, denied equal access to telework, isolated from communications, locked out of systems, denied advancement, subjected to hostility by her direct supervisor, and pushed to exhaust leave while caring for a disabled child during a pandemic could reasonably conclude that continued employment was no longer viable.

36

276.     Complainant did not resign precipitously or without attempting to preserve her employment. She sought flexibility, pursued leave, attempted to continue working, raised concerns internally, filed an internal EEO complaint, pursued agency relief, and remained on leave for an extended period while Defendants continued to deny her meaningful reintegration into her role.

277.     Those allegations show that resignation was a last resort, not a preference.

278.     By April 2021, after exhausting leave and workplace remedies and after continued discrimination, retaliation, and exclusion, Complainant was effectively forced to resign in order to avoid further financial and emotional harm.

279.     Complainant's resignation was therefore not voluntary in any meaningful sense but was the foreseeable and intended consequence of Defendants' conduct.

280.     As a direct and proximate result of Defendants' constructive discharge of Complainant, Complainant suffered loss of income, loss of benefits, loss of career opportunities, emotional distress, and other damages.

### Count VI— Discrimination in Violation of the District of Columbia Human Rights Act (D.C. Code § 2-1402.11 et seq.) [Against all Defendants]

281.     Complainant incorporates by reference all preceding paragraphs in Complaint.

282.     The District of Columbia Human Rights Act ("DCHRA") prohibits employers from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment because of, among other protected characteristics, race, sex, and family responsibilities.

283.     Complainant is a Black woman and a parent with family responsibilities, including caregiving responsibilities for minor children during the COVID-19 period.

284.     Complainant is therefore within classes protected by the DCHRA.

37

285. Complainant was qualified for her position and was performing her work successfully, as demonstrated by the allegations concerning her years of service, positive work history, management praise, and actual assumption of responsibilities beyond her formal title.

286. Defendants took adverse and differential action against Complainant in the terms, conditions, and privileges of her employment.

287. As alleged above, Defendants denied Complainant telework and flexibility, stripped her of core duties, denied promotion and compensation commensurate with her role, interfered with leave, excluded her from communications and systems, and ultimately forced her from her role.

288. Defendants' conduct was motivated, at least in part, by Complainant's family responsibilities. Complainant alleges that after she disclosed the practical realities of caring for her children during the pandemic, Sternbeck told her she should not be an "exception," instructed her not to put those issues in email, began treating her caregiving role as a workplace burden, tied her child's condition and caregiving obligations to alleged unpredictability, and used those notions to revoke telework and remove duties.

289. Those allegations fit squarely within the DCHRA's prohibition on discrimination because of family responsibilities.

290. Defendants treated employees without Complainant's family-responsibility burden more favorably.

291. Complainant alleges that employees who were childless or otherwise not similarly burdened by caregiving responsibilities were permitted telework or treated with greater flexibility, while Complainant's requests were denied and her role was diminished.

292.    Defendants' conduct therefore violated the DCHRA by discriminating against Complainant because of race, sex, and family responsibilities.

293.    As a direct and proximate result of the DCHRA violations, Complainant suffered compensable damages.

**Count VII— Retaliation in Violation of the District of Columbia Family and Medical Leave Act (D.C. Code § 32-507 and § 32-509) [Against All Defendants]**

294.    Complainant incorporates by reference all preceding paragraphs in Complaint.

295.    The DCFMLA prohibits an employer from interfering with, restraining, or denying the exercise of rights protected by the statute and from retaliating against an employee for requesting or taking protected leave.

296.    To establish retaliation under the DCFMLA, Complainant must show that she engaged in protected leave-related activity, that Defendants took materially adverse action against her, and that the adverse action was causally connected to her exercise of protected rights.

297.    Complainant engaged in protected activity by applying for and obtaining Paid Family Leave and Family Medical Leave Act leave related to her special-needs child, by requesting leave and flexibility related to that child's care, and by attempting to use approved leave and restored leave to address her child's therapy and related needs during the pandemic period.

298.    Defendants were aware of Complainant's protected leave-related activity.

299.    Sternbeck and Metzger were directly involved in discussing Complainant's leave, questioning it, routing it through HR, and commenting on Complainant's use of leave.

300.    Complainant also alleges that Sternbeck told her that she would not qualify for such benefits and continued to scrutinize her leave even after approval.

301.    Defendants took materially adverse action against Complainant after and because she exercised protected leave rights.

39

302.	Complainant alleges that on June 16, 2020, after consecutive days of leave, she was warned she would violate her union agreement if she used additional leave; that the same day Sternbeck began delegating her tasks to others; that management scrutinized her leave requests and falsely suggested some leave had not been approved; that Sternbeck and Metzger tied her schedule and role to her use of leave; that Metzger later acknowledged Sternbeck was retaliating against Complainant for taking leave for her disabled child; and that the stripping of duties, telework denial, negative evaluation, exclusion, and eventual displacement from her role all followed the same course of retaliatory treatment.

303.	The causal connection between Complainant's exercise of leave rights and Defendants' retaliatory acts is supported by close timing, direct statements, and the overall sequence of events.

304.	Complainant alleges that task-stripping began the same day management warned her about further leave use.

305.	She also alleges that Sternbeck repeatedly used Complainant's need for leave as a basis to cast her as unreliable, to justify withholding telework, and to support reducing her role.

306.	Defendants' conduct was retaliatory within the meaning of the DCFMLA because it imposed tangible professional harm on Complainant for exercising leave-related rights protected by law.

307.	As a direct and proximate result of Defendants' retaliation under the DCFMLA, Complainant suffered lost wages, lost opportunities, emotional distress, and other damages.

WHEREFORE Complainant respectfully requests that this Court enter a judgment in her favor on all counts, with respect to all claims against all defendants, Complainant requests consequential damages in the amount of Two Million Dollars ($2,000,000.00) plus pre- and post-

judgement interest, punitive damages against the individual defendants to the extent permitted by

law and for such other relief as this Court seems proper.

                                                Respectfully Submitted,
                                                KARIMAH BILAL
                                                By Counsel

*/s/ Reem Y. Rana*_____
Reem Y. Rana, Esq. DC Bar No. 90025752
TATE BYWATER
2740 Chain Bridge Rd.
Vienna, Virginia 22181
T: 703-938-5100
F:703-991-0506
E:rrana@tatebywater.com
*Counsel for the Complainant*

41